**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**

**v.**

**JONATHAN BARACH**

**CRIMINAL NO. 25-373**

<u>**DEFENDANT JONATHAN BARACH'S SENTENCING MEMORANDUM**</u>

This memorandum is respectfully submitted on behalf of Jonathan Barach, who is scheduled to be sentenced by the Court on April 8, 2026 at 1:00 p.m. For the following reasons, Mr. Barach respectfully requests that the Court impose a non-custodial sentence.

### I. Introduction

This is not a case about greed. It is not a case about stealing. It is not a case about intentional harm. It is not a case about a defendant whose actions were driven by a desire to live a lavish lifestyle. It is not a case in which the victims suffered any substantial financial hardship. And, of course, it is not a case about violence.

In short, this is not a case that requires a sentence of incarceration. Incarceration here would not further the goals of sentencing. And it is not a case that would break any new ground with a non-custodial sentence. Indeed, in the last five years alone, literally *dozens* of similarly situated federal defendants were sentenced to probation. A sentence of probation, therefore, would not create an unwarranted sentencing disparity.

### II. Jonathan Barach's Background

This *is* a case in which the defendant, Jonathan Barach, is so much more than the instant offense. Jonathan, or "JB," is loved, supported, and appreciated by those closest to him as demonstrated through the letters of support submitted to this Court. Over 35 individuals – including family members, friends, and coworkers from all walks of life – enthusiastically wrote

submissions to the Court expressing their unwavering support. Through these letters, a clear picture of Jonathan emerges: he is a selfless individual who helps others without expecting anything in return. He is dedicated to his family and his partner, Christine. He is a man of strong moral character who brings fun and light into all of his relationships.

Those fortunate enough to know Jonathan know him as a genuinely caring individual who never hesitates to go above and beyond for those around him. Jonathan is "the type of person who consistently checks in, remembers the small details, and shows up when it matters." H. Morgan Letter. He "genuinely cares about the well-being of others." S. Dickerson Letter. Jonathan is "extremely generous, and when he gives to people, he doesn't expect anything in return." B. George Letter. Jonathan "remembers details, follows up on things you've shared, and roots for the people in his life." R. Cox Letter. As described by Jonathan's friend, Ashley Leng:

> Since meeting him, Jonathan has always been in my corner, whether it's cheering me on while running a 10-mile race down Broad Street in Philadelphia, encouraging me to keep going during a challenging workout at F45, helping my fiancé Zach and me find our first home, or supporting us when we found out Zach's father was diagnosed with metastatic melanoma.

Similarly, Stephen and Meaghan Rech describe:

> He is the colleague who will quietly help someone else shine. He is the person who remembers to check in on birthdays and anniversaries, and the one who will spend hours helping a neighbor fix a leaky roof just because it's the right thing to do. We often reflect on how lucky we are to have a friend like him.

Beyond his generosity, Jonathan "has a rare ability to bring lightness and laughter into any situation. He has an infectious sense of humor and an energy that puts people at ease." H. Morgan Letter. "He lights up a room" and "transfers positive energy to those around him." B. George Letter. His "exuberance and zest for life is infectious." G. Barach Letter.

Professionally, Jonathan is known as an ethical and hard-working real estate agent in the Philadelphia community. His coworkers note that he "was almost always the first person in the

office each day, not out of obligation, but because he cared deeply about his work." S. Michiels Letter. As a real estate agent, he "approached his work thoughtfully and treated others with respect, patience, and sincerity." M. Pelegrin Letter. He is "fair and honest" with clients and has "tremendous integrity with his buyers." G. Aubrey Letter. As Mr. Aubrey, a home inspector with twenty-six years of experience, noted: "Jonathan was among the fairest realtors I ever encountered in my long career." *Id*. In a commission-based profession where sometimes a client's interest diverges from an agent's, Jonathan prioritized his clients and doing the right thing. As noted by a prior client:

> From our very first interaction, Jonathan showed care and interest in what was best for my fiance and me. Buying a home can be an overwhelming process, and Jonathan never once made us feel pressured or anxious. He was knowledgeable and insightful, but more than anything, he made it clear that his goal was to help us make the best decision for ourselves, whether that meant buying a house or not. That kind of honesty and genuine care is rare, and it told me a great deal about who Jonathan is as a person.
>
> There was a moment during our home search when we were seriously considering walking away from the process altogether. The market was difficult and we were feeling fatigued. Rather than talk us back into continuing for his own benefit, Jonathan sat with us, heard us out, and validated our concerns. He gave us his honest assessment of the situation, not a sales pitch, and said the decision was entirely ours. That conversation stuck with me. It showed me someone who genuinely prioritized the people in front of him over his own interests.

R. Cox Letter.

Jonathan is also involved in his community, serving as a condo board president for over four years. Presentence Investigation Report ("PSR") ¶ 65. As described by the property manager with whom he worked closely, "he did not treat his role as ceremonial or passive; he approached it with a strong sense of duty and responsibility to the community. He consistently demonstrated professionalism, integrity, and a genuine care for the residents." M. Ladner Letter. As president, he "consistently put the needs of the building and its residents above his own." K. Wells Letter.

3

To Jonathan's family, he is not just an important presence, but "foundational". E. Branning Letter. Jonathan is the older of two sons to Jo Ann and Gary Barach and is a large part of both of their lives. PSR ¶ 58. He is described as the "absolute rock" for his mother and her primary source of support and stability. V. Weinstein Letter. Jonathan's mother lives alone and he "reaches out every single day, even if it's just to check in." J. Barach Letter. Similarly, as his father explains, "JB is a part of my life every single day. He brings me comfort, laughter, and a sense of peace and calm. It is impossible to think about enduring even one day without hugging him." G. Barach Letter. His brother Michael describes Jonathan not just as his brother but his "best friend" and the "most loving and supportive brother in the world." M. Barach Letter.

The love, joy, and support Jonathan offers his family is exemplified by his close relationship to his six-year-old nephew:

> From the moment F.B. was born, Jonathan (lovingly known as "Uncle Jabbers") has been one of the most important figures in his life. They have spent countless hours together, talking about sports, playing games in the pool, exchanging trivia facts, and inventing silly games only the two of them understand. Every Christmas, Jonathan dresses up as Santa Claus, bringing magic and wonder to my son in a way he will remember for the rest of his life. When something exciting happens in F.B.'s world, he immediately wants to call or FaceTime his uncle to share it. Jonathan encourages F.B. in everything he does, celebrates his accomplishments, and helps him build confidence in himself. He loves F.B. with extraordinary depth, patience, and joy. He has been a consistently positive influence in his life. Their connection is truly irreplaceable.

E. Branning Letter.

Jonathan has been in a loving partnership with Christine Bonanno since 2015. PSR ¶ 64. His friends and family admire his unwavering dedication and loyalty to Christine. P. Miller Letter. He is "a loving partner who values commitment and puts family first." S. Rech Letter. As Christine describes, "Jonathan shows up in our relationship with consistent care, respect, and support. In the everyday moments of life, he is attentive, thoughtful, and deeply committed to those he loves. His

4

presence has brought stability and encouragement into my life, and he has helped me grow into a more patient, compassionate, and positive person." C. Bonanno Letter.

Jonathan has been an especially supportive partner recently, as he has helped Christine and her family navigate her mother's battle with Alzheimer's disease. Christine's sister explains:

> My mom has been suffering from Alzheimer's disease for the past ten years, and navigating her decline has been one of the most painful and complex challenges of our lives. Through every stage of this heartbreaking journey, Jonathan has been there. Not just in the easy moments, but in the hardest, most fragile ones. He helped me physically move her into memory care and later into a nursing home, never hesitating to shoulder the emotional and practical burdens that came with those transitions. He has never shied away from seeing her, expressing his love for her, or sitting with the reality of what we were losing. Jonathan made my mother laugh, comforted us through countless emotional moments, and created space for our grief to be seen and understood. He has cried with us, encouraged us, and helped carry the weight of anticipatory loss with extraordinary tenderness. His presence throughout this journey has been a source of strength and compassion that my sister and I have relied on more than words can fully express.

E. Branning Letter.

In short, the impact Jonathan has on his friends and loved ones cannot be overstated. He is a selfless friend, family member, and partner. The instant offense was an aberration from the person "of character, compassion, and integrity" he is known by many to be. K. Wells Letter.

## III.    The Offense Conduct and Applicable Guidelines Range

On September 23, 2025, Jonathan pled guilty to one count of wire fraud under 18 U.S.C. § 1343 and one count of an illegal monetary transaction under 18 U.S.C. § 1957. PSR ¶ 2. The instant offense occurred from July 2017 through April 2021. PSR ¶ 3. During this time, Jonathan borrowed money from individuals and businesses based on misrepresentations regarding the use of the money. PSR ¶ 12. More specifically, while soliciting loans, Jonathan made misrepresentations to the lenders, advising them that the funds functioned as bridge loans in order

to "flip" distressed real estate properties. *Id*. While Jonathan ultimately borrowed over $3,000,000, he has paid back over half of the amount. PSR ¶ 13.

The PSR states, and Jonathan agrees, that the applicable sentencing guidelines range is 30 to 37 months, based on a total offense level of 19 – largely driven by the "loss" of $1,496,928.99 – and a criminal history category of I. PSR ¶¶ 38, 97.

### IV.    Notwithstanding the Sentencing Guidelines, The Court Should Sentence Jonathan to a Non-Custodial Sentence Consistent with the Factors Outlined in 18 U.S.C. § 3553(a)

The advisory sentencing guidelines are just that – advisory and nothing more. They are one of several factors that the Court must consider at sentencing pursuant to *U.S. v. Booker*, 534 U.S. 220 (2005) and 18 U.S.C. § 3553. The Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). If a sentencing court reasonably determines that a sentence significantly different from the advisory guidelines range is appropriate, the disparity does not matter – the discretion lies with the District Court. *Gall v. United States*, 552 U.S. 38 (2007). Notably, the Supreme Court has specifically instructed that the guidelines *cannot* be presumed reasonable. *E.g., Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable guidelines range is reasonable."); *Gall,* 552 U.S. at 50 (a court "may not presume that the Guidelines range is reasonable . . . [and] must make an individualized assessment based on the facts presented.")

Notably, in the last five years alone, 45 federal defendants sentenced under §2B1.1 with an offense level of 19 and a Criminal History Category of I – the exact situation here – have been sentenced to probation. (And none of these 45 were cooperators who received a departure for

6

substantial assistance.) United States Sentencing Commission, *Judiciary Sentencing Information (JSIN) Dashboard*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard  (last visited Mar. 30, 2026).

The sentencing court may grant a downward variance based on reasons such as a defendant's prior life before the criminal conduct, reputation in the community, devotion to family, and rehabilitation. *E.g., United States v. Diambrosio*, 2008 WL 732031 at *3, (E.D. Pa. May 13, 2008.) In *Diambrosio*, the defendant was convicted of ten counts of wire fraud, resulting in an advisory sentencing guidelines range of 46-57 months. *Id*. After applying the § 3553(a) factors, the court concluded that a sentence of five years probation (including a one-year term of home confinement) and restitution was an appropriate sentence. *Id.* at *5. Specifically, the court considered that: (1) the conduct was non-violent; (2) the crime represented a marked exception to an otherwise law-abiding life; (3) the defendant had strong family and community ties; (4) the defendant already suffered from losing his job; (5) the defendant demonstrated post-offense rehabilitation; and (5) a non-incarcerative sentence would enable the defendant to continue to make restitution payments. *Id*.

Similarly, in *United States v. Howe*, the defendant was convicted of wire fraud, which carried an 18-24 month sentencing guidelines range. *United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008)  The Third Circuit affirmed the district court's sentence of probation and temporary home confinement, based on the facts that the defendant: (1) led an honorable and lawful life before his criminal conduct and had no prior criminal history; (2) served in the U.S. military for 20 years; (3) was a well-regarded member of his community; (4) regularly attended church; (5) was a devoted husband, father, and son; (6) made but an "isolated mistake" in committing his crime; and (7) was remorseful at sentencing. *Id*.

Here, as in *Diambrosio* and *Howe*, there are a number of reasons a below-guidelines sentence is appropriate: (1) Jonathan is a first-time, non-violent, zero-point offender; (2) his criminal conduct was an aberration from his otherwise law-abiding life during a time where his decision-making was clouded by a severe gambling addiction (as well as duress from dealing with loan sharks at Par Funding); and (3) Jonathan has shown remorse, stopped all criminal conduct over four years ago, and is fully committed to paying restitution. Notwithstanding the guidelines range, the totality of the Section 3553(a) factors strongly supports a non-custodial sentence, as explained in detail below.

### a.   18 U.S.C. § 3553(a)(1) - The Nature and Circumstances of the Offense

### i.   Circumstances of the Offense

While Jonathan takes full responsibility for his mistakes and has expressed remorse and regret for the negative impact his actions have had on his victims, it is important to note that his criminal conduct was not motivated by greed, materialism, or an intent to cause harm. Rather, the offense occurred during a period of his life in which he was struggling with financial chaos and instability driven by a crippling and all-encompassing gambling addiction. PSR ¶ 71.

Although addiction is often discussed in the context of drugs or alcohol, the American Psychiatric Association classifies pathological gambling as an addiction-related disorder. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 585 (5th ed. 2003). While often stigmatized as a shortcoming of control or moral fiber, gambling addiction is a disease. "Gambling addicts gamble the way an alcoholic drinks or a heroin addict shoots up – not impulsively, but in an all-consuming, life-controlling, and even life-threatening way. They are very ill, not impulsive." Alan Ellis, Mark H. Allenbaugh, Robert Hunter, Douglas C. Crawford, Gambling Addiction Making the Case for Sentencing Relief, Crim. Just., Fall 2015.

8

Accordingly, addiction can mitigate a defendant's culpability. *E.g., U.S. v. Dikiara*, 50 F. Supp. 3d 1029, 1032 (E.D. Wis. 2014). "By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences." *United States v. Hendrickson,* No. CR 13–4110, 2014 WL 2600090, at *5 (N.D. Iowa June 11, 2014).

In *Dikiara*, the court recognized the impact that the defendant's gambling addiction had on her criminal conduct and upheld a below-guidelines sentence for mail fraud relating to the embezzlement of more than $1,000,000 from the defendant's employer. *Dikiara*, 50 F. Supp at 1032. The court recognized that the defendant did not "desire to harm" or "steal in order to finance a lavish lifestyle," but instead the embezzled money fed her addiction and went straight to the casino. *Id*. The defendant fell into a trap "thinking she would eventually win enough to pay back the money she had taken" and kept "chasing" losses. *Id*. The court acknowledged that "this kind of addiction can lead from hoping for a big score to cover past losses on to illegal activity" and determined that, given the impact of defendant's gambling addiction, a below-guidelines range sentence sufficed to provide just punishment. *Id*. at 1032-33.

Here, like the defendant in *Dikiara*, Jonathan's gambling addiction caused him to get "in over his head" and make irrational and harmful decisions. PSR ¶ 75. He similarly "chased" losses with the faulty belief that his next bet would put him ahead. PSR ¶ 73. During the depths of his addiction, Jonathan was gambling between $500 and $1000 a game and accumulated debts he could not repay. PSR ¶ 72. Even after his financial situation had him soliciting loans from individuals and businesses – the basis for the instant offense – he continued gambling, beholden to his addiction. Jonathan's choices were not the actions of a rational, thoughtful decision-maker

but were born out of desperation and an "all-consuming, life-controlling" addiction. Alan Ellis, Mark H. Allenbaugh, Robert Hunter, Douglas C. Crawford, Gambling Addiction Making the Case for Sentencing Relief, Crim. Just., Fall 2015.[1]

Jonathan's financial position during this time was made even more complicated by his unfortunate decision to borrow money through merchant cash advance ("MCA") loans. PSR ¶ 32. During a time of financial desperation caused by his gambling, Jonathan borrowed money from Par Funding, a criminal organization that lent money to individuals through MCAs, which provided for substantial interest rates and challenging repayment terms. PSR ¶ 32 n. 5. He entered a loan agreement with Par Funding in August 2017, for $150,000. PSR ¶ 33. In January 2018, he entered into an additional agreement with Par Funding for another $150,000 (while still owing $116,666.68), expanding his debt with the organization. *Id*. His payment schedule consisted of large monthly and weekly payments, requiring him to pay $493,095.80 over a year and a half – a financial commitment way beyond his means. *Id*. True to the reputation of Par Funding, Jonathan faced harassment and aggressive collection tactics. He recalled being "scared out of his mind" and feeling trapped. PSR ¶ 75. In his "crazed mind" between facing threatening emails from Par Funding and being in the throes of his gambling addiction, his debts got out of control and he "began borrowing or collecting money from anyone he could." PSR ¶ 75.

This does not justify or excuse his conduct. Nor does it diminish the seriousness of the offense or its impact. Rather, it provides context and a fuller understanding of Jonathan's state of mind and relatedly explains how his gambling addiction diminishes his culpability. *E.g., U.S. v.*

---

[1] It is important to note, that as discussed more fully in section IV(e), Jonathan has since made great progress in managing and healing his gambling addiction. Although the path to recovery is not linear and Jonathan has had setbacks, he began meeting with a gambling counselor in 2021 and continues treatment for his addiction to this day. PSR ¶ 77, 80.

*Dikiara*, 50 F. Supp. 3d 1029, 1032 (E.D. Wis. 2014). This was not a sophisticated or "thought out" scheme. PSR ¶ 66. Rather, this was the behavior of a desperate man.

### i.    Nature of the Offense

Notwithstanding the harm Jonathan caused his lenders, this is not a case in which he "stole" money from victims. Instead, Jonathan always intended to pay back what he borrowed. PSR ¶ 14 n. 2. This is demonstrated through his actions, as well as by the charges *not* brought against him.

Significantly, Jonathan has paid back over half of what he borrowed. PSR ¶ 14 n. 1. As far back as 2019, and as soon as he realized that he was in over his head, he hired an attorney and conducted outreach to try to reach a resolution or settlement deal with his lenders. PSR ¶ 75. Jonathan successfully entered into payment plans with some lenders, and in fact, pays two victims regular monthly payments to this day. He pays Victim S.H. and Victim R.L. $250 and $500 a month, respectively. PSR ¶ 32 n. 6. He has not run away from his debts and remains committed to paying back his victims. PSR ¶ 32 (quoting "I intend to pay everybody back."). What's more, the instant offenses do *not* include tax charges. *See generally* PSR ¶ 1. This is because the money was not "stolen" and therefore not considered "income." Rather, Jonathan obtained the money via loans to be repaid, and he never viewed it or treated it any differently.

Furthermore, Jonathan is a zero-point offender. PSR ¶ 5. Although this is factored into his guidelines with a two-level reduction, factors that contribute to a low criminal history score or offense level may also weigh into a downward variance. *E.g., United States v. Chase*, 560 F. 3d 828, 830 (8th Cir. 2009). Consistent with the standards under §4C1.1 for a zero-point offender, Jonathan did not personally cause "substantial financial hardship." In determining whether a defendant's acts or omissions resulted in "substantial financial hardship" to a victim, the court considers the list of factors provided in Application Note 4(F) of the Commentary to §2B1.1. U.S.

Sent'g Guidelines Manual § 4C1.1(b). Therefore, consistent with the Sentencing Guidelines, as a zero-point offender, Jonathan did not cause his victims to become insolvent or file for bankruptcy. U.S. Sent'g Guidelines Manual § 2B1.1 Application Note 4(f). His victims did not suffer a substantial loss of retirement or investment funds. *Id*. His actions did not cause his victims to make substantial changes to their employment or living arrangements. Nor did his crimes impact anyone's ability to obtain credit. *Id*.

The government will undoubtedly rely on the victim impact statements outlined in the PSR to emphasize the impact Jonathan's actions had on the victims. While there are certainly victims who were affected by his actions, Jonathan did not personally cause "substantial financial hardship" to any individual. The government explicitly agreed and stipulated to as much in the plea agreement. PSR ¶ 5. Thus, to the extent any victim impact letter suggests otherwise, not even the government finds this credible.

### b.  18 U.S.C. § 3553(a)(1) - The History and Characteristics of Mr. Barach

Jonathan's "history and characteristics" are best explained by the dozens of people who wrote letters of support to the Court. Those who know him best commented that "this situation is entirely out of character" and noted that he "is someone who is capable of learning from this experience and moving forward in a positive and responsible way." P. Brady Letter. "In the time since these charges have been brought against him, he has changed his lifestyle, taken full responsibility for his mistakes and done everything in his power to make things right." D. Stein Letter.

As his partner Christine describes, "This past period has been incredibly difficult for both of us. His struggles and this legal situation have weighed heavily on our lives. Jonathan carries deep remorse for his actions, and I see the weight of that every day. He speaks often about the

12

impact of his decisions and his desire to make amends. More importantly, he is taking steps to ensure that he learns from this experience and continues on a better path forward." C. Bonanno Letter.

Jonathan is a first-time offender, and this crime is an aberration from his otherwise upstanding life. He has so much to offer his community and he is committed to working diligently in his real estate career and fulfilling his repayment obligations. PSR ¶ 79. He has strong family support and is surrounded by individuals committed to keeping him on the right path. L. Leibowitz Letter. ("I know he has a dedicated support system who will always be by his side.") Evaluating Jonathan through the eyes of his friends, neighbors and loved ones makes it clear that he is "someone with strong character, genuine empathy, and the capacity to continue contributing positively to the lives of those around him." S. Sanguina Letter.

### c. 18 U.S.C. § 3553(a)(2)(A) - The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A non-custodial punishment would be punitive for Jonathan while still allowing him to support his partner, spend time with his elderly parents, continue the mental health treatment he needs, and work towards fulfilling the restitution commitments to his victims. Courts have consistently recognized that a sentence of probation constitutes punishment. *E.g., Gall*, 552 U.S. at 48-49 (noting that defendants on probation are subject to substantial restrictions of their liberty). Inherent in the very nature of probation is that probationers "do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001). Although custodial sentences are more severe than non-custodial ones, "it is not *severe* punishment that promotes respect for the law, [but] *appropriate* punishment." *United States v. Olhovsky*, 562 F.3d 530, 551 (3d Cir. 2009) (emphasis in original).

13

Here, a non-custodial sentence would be appropriate and adequate punishment. *See e.g.* *United States v. Tomko*, 562 F.3d 558, 569 (3d Cir. 2009) (upholding a probationary sentence consistent with the sentencing goals of punishment, deterrence, and rehabilitation). Jonathan has already been punished and has faced harsh repercussions for his actions: he has suffered reputational harm from the publicity of this case,[2] he lost his job with Compass Realty, there are civil judgments against him, a petition for involuntary bankruptcy was filed against him, and he has suffered shame and humiliation. PSR ¶ 87, 92, 93; *see also Diambrosio* 2008 WL 732031 at *3 (explaining that probation was adequate punishment where defendant "already has paid a heavy price for his offense" including losing his job, being barred from securities industry, being fined, and facing a $2.1 million restitution obligation.)

A term of probation with appropriate supervision would be an appropriate further punishment that would reflect all the circumstances of the offense – and the offender – that would allow Jonathan to continue working, paying back the lenders, and trying to make the victims whole. *See e.g. Diambrosio* 2008 WL 732031 at *5 (holding that "a non-incarcerative sentence will enable Defendant to continue making payments on his $2.1 million restitution obligation.")

### d. 18 U.S.C. § 3553(a)(2)(B) - The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

Jonathan has shown remorse for his criminal conduct and is not at risk of re-offending. PSR ¶ 32 ("The defendant said that he takes '100% responsibility' for his illegal conduct, and he began addressing his mistakes before being charged by the government."). His ongoing mental

---

[2] *See e.g.* Emily Rose Grassi, *Philly real estate agent pleads guilty to loan fraud scheme totaling $3 million*, NBC Phila. (Sept. 23, 2025, 9:32 PM), https://www.nbcphiladelphia.com/news/local/jonathan-barach-pleads-guilty-to-real-estate-loan-fraud-scheme/4274446/; Michael Tanenbaum, *Philly real estate agent pleads guilty to defrauding investors and using money on gambling, personal expenses*, PhillyVoice (Sept. 24, 2025), https://www.phillyvoice.com/philly-real-estate-agent-guilty-loan-fraud-center-city/; Chris Palmer, *Jonathan Barach Charged with Wire Fraud*, Phila. Inquirer, (Aug. 22, 2025), https://www.inquirer.com/crime/jonathan-barach-charged-wire-fraud-20250822.html

health therapist noted that Jonathan, "has voiced accountability for the choices that resulted in his involvement with the criminal justice system. He has expressed commitment to continuing with reparations to those negatively impacted." PSR ¶ 80. As such, there is no need to sentence Jonathan to prison to effectuate deterrence from future criminal conduct.

In *Goss*, the court sentenced a defendant facing a guidelines range of 21-27 months for wire fraud to five years of probation, in part because "there was no need for prison to protect the public from or to deter this defendant." *United States v. Goss*, 325 F.Supp.3d 932, 933 (E.D. Wis. 2018). Namely, the defendant had no prior record, strong family support, and an otherwise positive background. *Id*. Here, Jonathan likewise has no prior record, proven family support, and is highly unlikely to "be in a position to do something like this again." *Id*.

Further, imposing a prison sentence would do little to increase deterrence when Jonathan is already facing other consequences – dealing with his status as a convicted felon, committing to paying appropriate restitution, and grappling with the damage to his professional and personal reputation. The lasting stigma and collateral consequences of his federal felony conviction, along with the proposed sentence of probation, provide more than sufficient general and specific deterrence in the attendant circumstances.

### e. 18 U.S.C. § 3553(a)(2)(C) - The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

Jonathan is not a threat to the public. His offense is a complete aberration for a 47-year-old man who has otherwise led a lawful life, brought so much joy to those around him, and has shown true remorse for his actions and the harm he has caused his victims. Jonathan is unlikely to offend again. He voluntarily stopped his criminal conduct a year before being approached by the authorities and has engaged in treatment for his gambling addiction for five years. These are important considerations, as the "likelihood that [a defendant] will engage in future criminal

conduct" is "a central factor that district courts must assess when imposing sentence." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011).

Notably, although the investigation into Jonathan's conduct began in April 2022, his borrowing stopped by April 2021. PSR ¶ 11, 18 n.3. In other words, he stopped all criminal activity a full year before he was ever approached by the authorities. *Id*. It was not the threat of criminal punishment that halted his behavior, but his own acknowledgement and acceptance of his wrongdoings.

In addition, Jonathan has taken concrete steps to alleviate the gambling addiction that so hindered his decision-making. He has not set foot in a casino since 2019. He first sought professional help for his addiction from a gambling counselor in 2021. PSR ¶ 77. He separately sees a licensed mental health therapist for regular counseling as well. *Id*. He currently alternates between attending weekly virtual sessions with his therapist and counseling with a representative from Birches Health in connection with his gambling addiction. PSR ¶ 78.

Jonathan's intentional and meaningful steps to recovery are critical factors for consideration in sentencing. His self-rehabilitation helps to satisfy both the deterrence and the protection of the public considerations in Section 3553(a). *See Gall,* 552 U.S. at 59 ("The District Court quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative. This also lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts."); *United States v. Edwards*, 595 F. 3d 1004,1017 (9th Cir. 2010) (noting the defendant was unlikely to reoffend based on post-offense rehabilitation).

16

**f. 18 U.S.C. § 3553(a)(2)(D) - The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The Court must consider the need for the sentence imposed to provide Jonathan with the needed correctional treatment in the *most* effective manner. 18 U.S.C. § 3553(a)(2)(D) (emphasis added). Here, the most effective treatment is for Jonathan to continue his gambling and mental health therapy that he is committed to and has undergone for years. His current mental health therapist advised that he "would continue to benefit from therapy as he navigates the sentencing hearing and subsequent life changes." PSR ¶ 80. If incarceration would be counterproductive from the viewpoint of rehabilitation, a departure from the guidelines is appropriate. *United States v. Nieman*, 828 F. Supp. 254, 255 (S.D.N.Y. 1993).

Here, pulling Jonathan away from his current treatment regimen would be detrimental to his rehabilitation. A survey of the First Step Act Approved Programs Guide from March 2026 shows that, currently, the Federal Bureau of Prisons offers one 4-credit hour program connected to gambling titled: "CBT for Prison Gambling." Fed. Bureau of Prisons, U.S. Dep't of Justice, *First Step Act Approved Programs Guide* (Aug. 2025), https://www.bop.gov/inmates/fsa/docs/fsa-approved-program-guide.pdf.  It consists of only four face-to-face sessions lasting one hour. *Id*.

This treatment cannot compare to the personalized weekly sessions of gambling counseling and mental health therapy that Jonathan currently receives. The *most* effective manner for him to continue his addiction recovery is to maintain the treatment that he is currently undergoing and committed to seeing through. *See, e.g., United States v. E.L.*, 188 F. Supp 3d. 152, 174 (E.D.N.Y. 2016) ("A sentence of probation will allow defendant to continue engaging in treatment, further decreasing his chance of re-offending."); *United States v. Gonzalez*, No. 03 CR. 0285, 2004 WL 230992 at *6 (S.D.N.Y. February 5, 2004) ("A period of probation, when combined with

17

continuing counseling, education and employment, would also serve the aim of rehabilitation, a process which has already begun for Gonzalez."); 18 U.S.C. § 3553(a)(2)(D).

### g.  18 U.S.C. § 3553(a)(3) - The Kinds of Sentences Available

Section 3553(a)(3) requires the Court to consider the kinds of sentences available, including non-incarcerative alternatives. *E.g., Gall*, 552 U.S. at 59 ("The Guidelines are only one of the factors to consider when imposing [a] sentence, and §3553(a)(3) directs the judge to consider sentences other than imprisonment."). Probation is "not granted out of a spirit of leniency." *Id*. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases, receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court. *Id.* at 48-49. As detailed in Section IV(c), a probationary sentence here would be adequately punitive by significantly limiting Jonathan's liberty and imposing restrictions on his activities while letting him continue to focus on his mental health treatment and restitution obligations.

### h.  18 U.S.C. § 3553(a)(4) - The Kinds of Sentence and the Sentencing Range Established as Set Forth in the Guidelines

Under 18 U.S.C. § 3553(a)(4), the Court must evaluate the sentencing range as set forth in the guidelines. Here, the guidelines range is 30-37 months, consistent with a total offense level of 19 and a criminal history category of I. PSR ¶ 97. However, the total offense level is largely dictated by the 14-level enhancement under USSG §2B1.1(b)(1)(H). This 14-level increase, which is solely determined by the "loss" amount, dominates the guidelines calculation and overstates the culpability of Jonathan's offense, resulting in a guidelines range that is artificially high.

18

Courts across the country have lamented that the guidelines loss table is an "unfair proxy for culpability" and "should not drive the sentencing process[.]" *United States v. Prosperi*, 686 F.3d 32, 50 (1st Cir. 2012); *see also United States v. Emmenegger,* 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) ("The Guidelines place undue weight on the amount of loss involved in the fraud. . . . In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (explaining that "[o]ne of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level").

Instead of mechanically following the guidelines' harsh recommendations for a sentencing based on the loss table, courts should place greater weight on the factors set forth in 18 U.S.C. § 3553. The Court should do so here, particularly in light of the fact that Jonathan is a first-time offender with a base offense level of only seven. *E.g., United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.").

### i.    18 U.S.C. § 3553(a)(5) - Any Pertinent Policy Statement

Regardless of the offense level and applicable guidelines, the Court always maintains the ultimate discretion in sentencing under *U.S. v. Booker*, 534 U.S. 220 (2005) and 18 U.S.C. § 3553. But further supporting a probationary sentence here are the 2026 proposed amendments to the sentencing guidelines. These would in fact encourage the Court to consider a non-custodial sentence.

Published in January 2026, the amendments proposed by the United States Sentencing Commission purport to expand Zones B and C of the Sentencing Table.[3] The proposed Zone B encompasses an Offense Level of 19 and a Criminal History Category of I – the applicable range here. Under the proposed amendments, "Zone B" authorizes a sentence of probation, provided that the minimum term of imprisonment specified in the guideline range is satisfied by a period of intermittent confinement, community confinement, or home detention.

Although these amendments have not been adopted yet, from 1987 to 2024 Congress has rejected only two amendments out of over 800 proposed. Congressional Research Service, *Amending the U.S. Sentencing Guidelines* (April 28, 2025), https://www.congress.gov/crs-product/IG10078. Thus, the law is undoubtedly headed in a direction where a sentence of probation here would be consistent with the Sentencing Commission's input and considerations.

### j.  18 U.S.C. § 3553(a)(6) - The Need to Avoid Unwarranted Sentence Disparities

Imposing a sentence of probation here would not break any new ground but instead would be consistent with dozens of similarly situated cases in the federal system. According to the Judiciary Sentencing Information (JSIN), in the last five years, 45 defendants whose primary guidelines were determined under §2B1.1, with a Final Offense Level of 19 and a Criminal History Category of I, received probation or a fine only. United States Sentencing Commission, *Judiciary Sentencing Information (JSIN) Dashboard*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited Mar. 30, 2026). Accordingly, sentencing Jonathan to probation would not be an anomaly, but rather a sentence consistent with many other recent cases. *Id.*

---

[3] U.S. Sent'g Comm'n, *Reader-Friendly Version of the Proposed Amendments to the Sentencing Guidelines* (Jan. 30, 2026), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202602_rf-proposed.pdf

Indeed, there are plenty of cases with defendants facing *worse* guidelines and *worse* offense conduct, who were ultimately sentenced to probation. *E.g.*, *United States v. DiAmbrosio*, No. 04-66, 2008 WL 732031, at *3, *5 (E.D. Pa. Mar. 18, 2008) (imposing non-custodial sentence despite a sentencing guidelines range of 46-57 months of imprisonment); *United States v. Rowan*, 530 F.3d 379, 380 (5th Cir. 2008) (upholding a sentence of sixty months of probation for a defendant who pled guilty to illegal possession of child pornography and whose guidelines range was 46-57 months of imprisonment); *United States v. Davis*, 20 F.4th 1217, 1219 (8th Cir. 2021) (affirming sentence of time served [two months] and 120 months of supervised release, including one year of home confinement, for a defendant who pled guilty to attempted coercion or enticement of a minor in violation of 18 U.S.C. § 2422(a) and whose guidelines range was 46-57 months); *United States v. Whitehead*, 532 F.3d 991, 992 (9th Cir. 2008) (affirming decision of district court that calculated a guidelines range of 41-51 months, but imposed a more lenient sentence of probation, community service and restitution).

In sum, a sentence of probation here would not create an unwarranted sentence disparity. But even if it did, the Supreme Court has explained that although sentencing uniformity is an important goal of sentencing, "some departures from uniformity [are] a necessary cost of the remedy." *Kimbrough v. United States*, 552 U.S. 85, 88 (2007). Thus, "while the imposition of a probationary sentence may result in a sentencing disparity, the Supreme Court has recognized this is an inevitable consequence of *Booker*." *Diambrosio*, 2008 WL 732031 at *3.

### k. 18 U.S.C. § 3553(a)(7) - The Need to Provide Restitution to Any Victims of the Offense

Finally, a probationary sentence would aid in providing restitution to the victims, consistent with the goals of sentencing. Jonathan has paid over half the amount he borrowed and remains committed to making his victims whole. To this day, he pays back multiple lenders through

monthly payment plans. Sentencing Jonathan to prison would only re-victimize his victims because it would prevent him from continuing to work and repay his debts efficiently. *E.g., Goss*, 325 F. Supp. at 936 (holding that "a prison sentence would harm the victim by causing defendant to lose her job and thus her ability to pay restitution, a significant concern under § 3553(a)(7)").

In fact, victim R.L. explained in his victim impact letter that "while the repayment is happening painfully slowly, it is an essential component of our budget, and it is happening. Any interruption of this repayment, or reduction in the rate of return would further victimize us in his malfeasance." PSR ¶ 29; *see also* D. Stein Letter ("If he were to get a custodial sentence, that would put a stop to all payments to me and his other lenders because he'd have no way of generating revenue."); G. Reedy Letter ("If he were to be incarcerated, he would not be able to continue making payment. This does not do any justice to JB or to us."). With a probationary sentence, Jonathan could continue working and paying back his victims in a meaningful way.

## V.    Conclusion

As the letters of support illustrate, and as explained in detail above, Jonathan Barach is a selfless, caring, and dedicated family member, partner, friend and neighbor. Against this background, the instant offense, driven in part by a crippling gambling addiction, is a marked deviation from the way he has lived his life. He is remorseful, has taken responsibility for his actions and is committed to his recovery. There is no need for incarceration, given that Jonathan is at low risk for recidivism, is deep into his path of rehabilitation, and is not at all a danger to the public.

Accordingly, for the foregoing reasons, we respectfully request that the Court pronounce a non-custodial sentence, which is strongly supported by the sentencing factors in Section 3553(a).

Dated: April 1, 2026

Respectfully Submitted,

*/s/ William M. McSwain*
William M. McSwain (PA Bar No. 86499)
Katherine Kovalsky (PA Bar No. 345945)
30 South 17th Street
Philadelphia, PA  19103-4196
(P): 215-979-1000

*Counsel for Defendant Jonathan Barach*

## CERTIFICATE OF SERVICE

I hereby certify that, on this this first day of April, 2026, I caused to be served a true and correct copy of the foregoing Defendant's Sentencing Memorandum, by the means indicated:

Samuel S. Dalke, Esq., Assistant United States Attorney
Terri Marinari, Esq., Assistant United States Attorney
U.S. Attorney's Office for the Eastern District of Pennsylvania
615 Chestnut St., Ste. 1250
Philadelphia, Pa. 19106
Samuel.s.dalke@usdoj.gov
Terri.Marinari@usdoj.gov
(*via electronic filing and electronic mail*)

George McGary, Senior United States Probation Officer
United States Probation Office, EDPA
William J. Green Federal Building
600 Arch St.
Philadelphia, Pa. 19106
George_McGary@paep.uscourts.gov
(*via electronic mail*)

s/ *Katherine Kovalsky*
Katherine Kovalsky